cability of getting a new assessment by the proper officers at this time, the injunction asked for should be refused and the bill dismissed at the plaintiffs' costs.

*Error assigned* was the decree of the court dismissing the bill.

*M. J. Martin*, with him *John G. McAskie*, for appellants.

*John P. Kelly*, with him *John J. Toohey*, county solicitor, *Clarence Balentine*, *Joseph O'Brien* and *William J. Fitzgerald*, for appellees.

PER CURIAM, March 16, 1908:

If the appellants were aggrieved by reason of the excessive valuation of their properties for taxation, the law furnished an adequate remedy by appeal to the county commissioners and to the court of common pleas. They had no standing in equity to raise that inquiry. The legality of the assessment was the only question properly involved. The failure of the appellants to sustain the allegation that the valuations had not been fixed by the assessors acting together as a board was conclusive of the controversy.

The decree is affirmed at the cost of the appellants for the reasons stated in the opinion of the learned judge of the common pleas.

---

# Bradbury, Appellant, *v.* Burschell.

*Taxation—Levy of taxes—Discretion of county commissioners—Estimates by controller—Equity.*

Equity can only interfere with the functions of the county commissioners either for disregard of a positive duty as prescribed by statute, or a clear abuse of discretion.

Section 5 of the Act of June 27, 1895, P. L. 403, prescribes the duty of the controller, inter alia, in respect to advising the commissioners annually as to the probable expenditure for the fiscal year. It does not undertake to restrict the power of the commissioners in and about levying the taxes to the limits of the controller's estimate.

In exercising the power of the county to levy taxes the commissioners are by necessary implication vested with a reasonable discretion in determining the amount to be levied. In the exercise of that discretion they have the right to consider, in addition to the controller's estimate (1), an uncertainty as to the final assessment due to the extensive advance in valuations in accordance with their attempt to equalize them in a triennial year; (2) an existing deficiency in the sinking fund; (3) an increase in the expenses for witnesses and jurors that could not be foreseen at the time of the controller's estimate; (4) any expense, such as registration, etc., not covered by the estimate; and (5) any probable expense for general repairs to the county bridges, reindexing records and erection of a house of detention, as contemplated by them.

In view of a deficiency in the sinking fund the commissioners have the right to levy for that purpose more than would have been required had the fund been regularly provided for. They cannot, however, add to that fund any surplus that might remain from any other part of the levy.

The fact that either the nominal or estimated proceeds of the levy largely exceed the total estimate of the controller does not in itself show a breach by the commissioners of any legal duty.

Argued Feb. 24, 1908. Appeal, No. 53, Jan. T., 1908, by plaintiffs, from decree of C. P. Lackawanna Co., Nov. T., 1907, No. 10, dismissing bill in equity in case of Charles E. Bradbury et al., Taxpayers, v. Victor Burschell et al., County Commissioners. Before FELL, BROWN, MESTREZAT, POTTER and STEWART, JJ. Affirmed.

Bill in equity for an injunction.

NEWCOMB, J., filed the following opinion:

The prayer of this bill is: 1. For a decree annulling the levy of county taxes for the current year; 2. For an injunction to restrain the collection of such taxes; and 3. For an order in the nature of a mandatory injunction directing the commissioners to make a levy in conformity with the estimates of the controller.

From the pleadings, evidence and arguments of counsel I find the following:

### CONCLUSION OF FACT.

1. The plaintiffs are resident taxpayers of this county. The defendants are the county commissioners joined with the sev-

eral collectors of county taxes. Having in 1900 attained a population of upwards of 150,000 the county has had since 1901, the office of controller in place of auditors. The office was in the first instance, filled by appointment of the present incumbent, Edward A. Jones, who has continued to serve ever since by virtue of successive elections.

2. In pursuance of the act of June 27, 1895, creating the office and prescribing the-duties of the controller in such counties, Mr. Jones, on February 1 this year, submitted to the commissioners his estimate in detail of the probable expenditures to be incurred by the county for the fiscal year beginning January 1, 1907. This included a statement of the bonded indebtedness and the amount of money that should stand to the credit of the sinking fund at the end of the year, together with the amount in the fund at that date.

3. This being a triennial year the commissioners with a view to equalizing assessments undertook an extensive examination not only of surface but also of underlying mineral lands, which form a large part of the taxable property of the county. This resulted in delaying the levy until September 19. The total valuation as it then stood on their books was $91,670,277. The rate established was five and one-half mills on the dollar.

Duplicates were thereupon issued to the collectors accordingly.

The form of action taken in fixing the rate was by resolution recorded in the commissioners' minutes, as follows:

" On motion by Mr. Burschell, seconded by Thomas, the following resolution was adopted : Resolved for the purpose of defraying the estimated expense of Lackawanna county as submitted by the county controller for the year 1907, the following levy upon the taxable property in said county for the year aforesaid be made, for general county purposes four and one-half mills on each assessed dollar of valuation, for sinking fund purposes three-fourths mills on each assessed dollar of valuation, for bridge fund purposes one-fourth mills on each assessed dollar of valuation, being in all five and one-half mills upon each dollar of assessed valuation, of all taxable property in Lackawanna county, for the fiscal year 1907, a levy of five and one-half mills on each dollar is hereby made for said year and there is hereby levied a per capita tax of one dollar upon

each male dog and two dollars upon all female dogs in the county of Lackawanna except in the cities of Carbondale and Scranton, for the year 1907."

4. It is apparent that at this rate the levy would on the face valuation, yield $504,186.53, and exclusive of the sinking and bridge funds would exceed the controller's estimate by upwards of $200,000. It is conceded that the valuation of these properties varies largely from what it has been heretofore, and that as to them the attempt at equalization is somewhat experimental. So far as that fact may be relevant, its effect is to leave the total valuation as ultimately to be settled very uncertain.

5. In asserting the right to exercise some discretion in the premises the commissioners regarded the controller's estimate as too low in several instances. In particular it was so considered with respect to the cost of registration which was omitted and amounts to about $30,000. This item has been more than doubled by act of assembly passed some months after the estimate was submitted. The same was in a measure true as to its items, "Court expenses" and "Commonwealth's cost," both of which had been increased by Act of June 1, 1907, P. L. 364. The controller's estimate for bridges referred only to the cost of restoring bridges destroyed by flood, without reference to new bridges or repairs occasioned by ordinary wear and decay. Since March 30, 1905 (P. L. 81), there had been a statute requiring the county to make such repairs, but it had as yet been overlooked or ignored in making the estimates in this county. By September, this year, demands for such repairs were becoming somewhat urgent. A constable's return of certain bridges as unsafe had been referred to the September grand jury by whom a report was made calling attention to the statute as requiring action by the county commissioners. This circumstance does not distinctly appear in the evidence but is believed to be what Commissioner Burschel intended to refer to when he testified: "Since the controller made his estimate a law has been enacted which compels the county to take care of all bridges." Evidently he erroneously supposed the proceedings before the grand jury were based on the Act of February 14, 1907, P. L. 3. But that simply enlarges the powers of the county with

reference to altering county bridges.   While it makes the action of the commissioners dependent on the recommendation of the grand jury, the law " which compels the county to take care of all bridges " is the act of 1905.   The expense of such repairs might be considerable in view of the fact that the county already has some 250 bridges.   The controller's estimate was not intended to cover the possible expense of reindexing the records in the prothonotary's and recorder's offices, the need of which is urgent and had been recommended by the court in conference on the subject between the commissioners, the controller and the judges.   The cost of that would be no small item, probably upwards of $50,000.   While it does not so appear on the evidence, it is only fair, considering the nature of the case, to say that no order for reindexing had been made because of the lack of funds available for the purpose.   Aside from these things the controller estimated nothing for the county's share of a state road then being projected and for which contracts have since been awarded, involving a possible expenditure of $6,000 to $8,000.

6. Hence it was by no means apparent that the controller's estimate would cover the probable demands on the county. On the contrary, unless it could be supposed that the items "Contingencies" and "Miscellaneous," aggregating $17,800, would be adequate to meet the increased expense for witnesses, jurors and registration, its inadequacy would naturally suggest itself, except so far as it might be made up from an excess in the receipts from liquor licenses, personal state tax, county officers, etc.   The receipts from those sources exceeded the estimate by nearly $17,000, most of which had been realized at the time of the levy and, therefore, may be presumed to have been known to the commissioners.   Yet those three sums, aggregating less than $35,000, could hardly have been assumed to be more than enough to meet the cost of registration and primaries which had been omitted from the estimate and the additional court and commonwealth's cost as in the meantime increased by statute.   If, in other items, the variations could be assumed to balance each other, there would still be no apparent margin for any additional expenses which the commissioners felt bound to and did consider, such as the cost of bridge repairs and new records, both of which were

likely to call for large sums. The same is true with regard to the cost of a house of detention which had been considered in conference between the judges, commissioners and controller. The only estimate by the controller in that regard was to cover the current expenses. The commissioners had in mind the erection of a building, on premises owned by the county, at a cost of something like $15,000. This, of course, depends upon the recommendation of the grand jury. While there is no evidence that such recommendation has been made, we believe it is on file.

7. It turns out that so far as it went the estimate did fairly cover the expenditures actually incurred to date, being too low in some particulars and ample in others.

What amount will be required to complete the payments for the year cannot now be ascertained. The controller estimates that he will pay out during the month $35,000 more. But whether that will cover all the accounts for the fiscal year ending with this month is uncertain.

8. The bonded indebtedness of the county on January 1, 1907, was $510,000 and is made up of the several issues shown in the schedules of the controller's statement coupled with his estimate as set forth in the second conclusion. The issue of 1902 was a refunding of several earlier issues in 1903. In that year a sinking fund tax was first levied, no provision for the redemption of bonds having been theretofore made. To some extent that may account for the disparity between the amount of that fund as it is and the amount which ought to stand to its credit. Reference to the controller's statement shows that in his opinion it should have to its credit at the end of this year $171,816.64 and that at the beginning of the year it had a little upwards of $25,000. How much it is actually short of what it ought to be has not been shown and I have not undertaken to calculate. But that the disparity as shown by the estimate is to some extent unreal is evident from the fact that the $171,816.65 includes both principal and interest, while the interest has been paid to the first of this year. So the figures would seem to be the result of a method of bookkeeping in which the canceled coupons are carried forward on the debit side of the account with a view to its ultimate balance as the bonds mature. On the other hand, no interest appears to

have been calculated for the fractional part of the fiscal years in which the bonds were issued.   This makes an apparent deficit on the debit side as calculated by the controller of $26,123.61.

9. According to the terms of the bonds the amount which would be regularly required this year for the sinking fund would be $45,316.66.

10. It is thus apparent that, whatever the levy may have been heretofore for sinking fund purposes, the amount actually realized by the fund is by no means equal to the principal sum the county should now have on hand.   Whether that is due to an insufficient levy or to the failure of collections does not appear.   Some part of the deficiency no doubt will eventually be met by the interest which is accruing to the fund in bank.

11. It is conceded by plaintiffs that considering the fact that this is a triennial assessment an allowance of fifteen per cent in place of the estimated ten per cent would only be a reasonable reduction for abatements, etc. . The face of the levy for sinking fund would amount to $68,752.21.   Deducting fifteen per cent would leave $58,439.80, which would exceed the amount required if the fund had been regularly provided for.

12. The same allowance would reduce the total nominal revenue from $504,186.53 to $428,558.56.   Adding to that the receipts for licenses, office earnings, etc., $126,939.45, would bring the possible revenues up to $555,498.01.

13. Adding the estimate of $35,000 to the total disbursements of $321,540.66 to December 1, would make a total of $356,540.66, to which add bridge fund, $7,500.39, and sinking fund, $45,316.66, makes a total possible expenditure of $409,357.71.

14. This would leave a possible excess of revenue over expenditures of $146,140.30.   But that is neither certain, nor was it reasonably apparent to the commissioners in view of the uncertainly as to the extent of abatements and the expenditures that were liable to arise.   The county may be called upon at any time for extraordinary expenses in replanking and making other repairs to the numerous bridges.   The reason why it has not been as yet called upon to incur the expense

of reindexing the records has already been noted. If it be conceded that there is nothing to prevent the collection of the amount levied for sinking fund, then the possible excess would be smaller. It might be reduced to $122,704.25.

### CONCLUSIONS OF LAW.

1. Equity can only interfere with the functions of the county commissioners either for disregard of a positive duty as prescribed by statute, or a clear abuse of discretion.

2. Sec. 5 of the Act of June 27, 1895, P. L. 403, prescribes the duty of the controller, inter alia, in respect to advising the commissioners annually as to the probable expenditures for the fiscal year. It does not undertake to restrict the power of the commissioners in and about levying the taxes to the limits of the controller's estimate.

3. In exercising the power of the county to levy taxes the commissioners are by necessary implication vested with a reasonable discretion in determining the amount to be levied. In the exercise of that discretion they have the right to consider, in addition to the controller's estimate: (1) An uncertainty as to the final assessment due to the extensive advance in valuations in accordance with their attempt to equalize them in a triennial year; (2) an existing deficiency in the sinking fund; (3) any increase in the expenses for witnesses and jurors that could not be foreseen at the time of the controller's estimate; (4) any expense, such as registration, etc., not covered by the estimate; (5) any probable expense for general repairs to the county bridges, reindexing records and erection of a house of detention, as contemplated by them.

4. In view of a deficiency in the sinking fund the commissioners have the right to levy for that purpose more than would have been required had the fund been regularly provided for. (Therefore they are within their legal rights in levying and collecting the supposed excess for that fund if collected in full, viz.: to the amount of $68,752.71.) They could not, however, add to that fund any surplus that might remain from any other part of the levy.

5. The fact that either the nominal or estimated proceeds of the levy largely exceed the total estimate of the controller does not in itself show a breach by the commissioners of any

legal duty.  Neither does that fact, coupled with the circum-
stance  that there may be a possible excess of upwards of
$100,000 over the actual demands on the treasury for the cur-
rent year, warrant the conclusion that there was a clear abuse
of their discretion in the premises.

6. The facts found are insufficient to warrant a decree for
the relief prayed for, and, accordingly, the bill should be dis-
missed at the plaintiffs' cost.

### DISCUSSION.

Argument was heard and the case submitted December 20th,
inst.  While counsel have been urgent for a speedy disposition
of it we have not the benefit of briefs on either side.  The best
consideration possible, in the limited time to be had in view of
other official engagements, has been given to the several ques-
tions raised.

That equity may restrain the collection of taxes unlawfully
levied is not open to question.  Relying upon that jurisdiction
the plaintiffs attack this assessment as unlawful, first, because
on its face it exceeds the controller's estimate, and, if not that,
second, because there was an abuse of the commissioner's dis-
cretion in levying an amount which bids fair to exceed by up-
wards of $100,000 the actual expenditures of the fiscal year.

It is freely admitted by the learned counsel for plaintiffs
that the validity of the first position depends upon the con-
struction of sec. 5, Act of June 27, 1895, P. L. 403.

If it be construed as taking away all discretion from the
commissioners and devolving upon the controller the exclusive
power of determining the amount of taxes to be levied it is
not apparent how there would be any escape from the conclu-
sion that to this extent the section is repugnant to the consti-
tution.  Its title is,  " An act creating the office of County
Controller in counties of this commonwealth containing one
hundred and fifty thousand inhabitants and over, prescribing
his duties, and abolishing the office of County Auditor in such
counties."  This gives no intimation of any purpose to reor-
ganize the powers of the commissioners' office by transferring
its most distinctive and important function to the controller.
Yet, if bound by the controller's estimate the duty of the
commissioners so far as concerns the amount of taxes to be

raised becomes merely perfunctory; a purely clerical or ministerial function. If there be two obvious constructions of a statute one of which is offensive to the constitution the other will be adopted. But we do not feel driven to that choice of constructions.

Considering the nature of the duties prescribed for the controller, together with the extent and character of the public accounts to be kept in his office, it is manifest that his accounts at the beginning of each year were intended to form a source of information as definite and complete as possible, covering the ordinary expenses for the preceding year; and that the commissioners should have the benefit of such advice as the accountant could give by way of detailed estimates prepared in the light of such accounts. We are not impressed with the contention that such estimate was intended to operate as a restriction beyond which the commissioners may not lawfully go in making their levy. That position is wholly untenable except on the theory referred to that the function of determining the amount of taxation theretofore vested in the commissioners is no longer with them but by the act of 1895 was transferred to the controller. It may be true that the terms of the act can fairly be construed as limiting the minimum amount to be levied. In providing that the commissioners "shall fix such rate of taxation . . . . as will raise a sufficient sum to meet the said expenditures" it may be meant that they shall not go below the controller's estimate. But that we are not called upon to decide; neither do we express any opinion as to whether there would be any objection to such construction on constitutional grounds. In respect to the theory that the estimate binds the commissioners we are only called upon to determine whether the attempt to raise more revenue than was estimated is prohibited by the statute, and we hold it is not. To hold that it is would put the county to the risk of grave embarrassment by an error of the controller's judgment. It is conceivable that some controller might estimate the total expenses that in his opinion should be incurred at $100,000, while to a moral certainty the commissioners would know that they would amount to three times that figure. Short of this the plaintiff's theory, if sound, cannot stop.

Obviously the question of abuse of discretion is an alterna-

tive.  For this ground cannot be assumed without surrendering the other.   This position, however, has the advantage of being free from technical objections.   But on the merits it fails because it cannot be said with any certainty that from the standpoint of the commissioners the levy was excessive in view of the probable expenses for which provision could legitimately be made.   Nothing less than an unreasonable surplus then apparent would show a clear abuse of their powers.   Had this not been a triennial year a somewhat different question might have been presented.   Had there been no novel method resorted to with a view to equalization resulting in a marked advance in coal assessments, the question might be very much simplified. The practical difficulties to be contended with in determining the extent and value of such lands are not to be entirely overlooked in considering the weight of the argument based upon the face of the levy.   Under the conditions as they are no one can now tell what the final valuation will be.   So far as concerns the possibility that $68,000 and some odd hundred dollars may be raised for the sinking fund, the case is free from difficulty, even though under normal conditions $45,316 would have met this year's requirement.   The existing deficiency in the fund will have to be made up some time.   There is no claim that the full face of that levy would, if collected, bring the fund up to its present requirements.   What proportion of the deficit shall be levied this year is, we apprehend, for the commissioners to determine.   Their power to levy taxes to complete this fund is the same as the power to make a levy to pay a debt presently due and demandable.   What amount may be required to meet the general demands on the county for this year's taxes is somewhat conjectural.

But even though there should be a surplus of upwards of $100,000 in view of the expenditures additional to the controller's estimate which they had reason to anticipate, that event will not serve to overcome the presumption that the commissioners exercised their discretion fairly and reasonably.   Nor is the inference contended for aided by the circumstance that in form the import of the resolution fixing the rate suggested a levy in accordance with the estimate.   In substance the thing done shows there was no intention to conform to the figures submitted by the controller.   They have given their reasons

for exceeding the estimate. There is nothing to contradict their testimony and we cannot say their reasons were invalid. It follows that the plaintiffs failed to make good their complaint that the levy was unlawful, and, consequently, the court cannot interfere with its enforcement.

*Error assigned* was decree dismissing the bill.

*M. J. Martin*, with him *John G. McAskie*, for appellants.

*John P. Kelly*, with him *John J. Toohey*, county solicitor, *Clarence Balentine*, *Joseph O'Brien* and *William J. Fitzgerald*, for appellee.

PER CURIAM, March 16, 1908 :

Nothing can profitably be added to the thorough and able discussion of the question involved by the learned judge of the common pleas. The decree is affirmed on his opinion at the cost of the appellants.

---

# Flood, Appellant, *v.* Ryan.

*Wills—Charities—Death within thirty days of will—Act of April 26, 1855, P. L. 328.*

A gift will not be deemed charitable merely from the nature of the professional character of the devisee.

Where a testator devises land to a church of which he is a member and to a charitable institution maintained by the denomination of which he is a member, and provides that in case of his death within thirty days from the date of his will the property devised shall go to the bishop of the diocese in which he lives, and it appears that there was no secret agreement, promise or arrangement between the testator and the bishop as to how the latter should use the property, the devise is good to the bishop, and not in violation of the Act of April 26, 1855, P. L. 328, although the bishop acknowledges that he intends to hold the property for the church and for the institution designated in the testator's will.

Testator by his will devised as follows: "All the rest, residue and re-